In re GRAND JURY PROCEEDINGS, HARRISBURG, PENNSYLVANIA.

In the Matter of Joques EGAN, Appellant.

No. 71-1088.

United States Court of Appeals, Third Circuit.

Argued Jan. 29, 1971 and Submitted on Briefs Feb. 5, 1971.

Reargued En Banc April 5, 1971.

Decided May 28, 1971.

As Amended June 16, 1971.ˈ

Dissenting Opinion Nov. 11, 1971.

Certiorari Granted Dec. 14, 1971. See 92 S.Ct. 531.

Hastie, Chief Judge, joined in opinion; Seitz, Circuit Judge, concurred in result based on part II; Van Dusen, Circuit Judge, concurred in part II only; Rosenn, Circuit Judge, joined in part II and filed separate concurring opinion in which Seitz and Van Dusen, Circuit Judges, joined; Gibbons, Circuit Judge, dissented and filed opinion in which Aldisert, and Forman, Circuit Judges, joined.

William T. Coleman, Jr., Dilworth, Paxson, Kalish, Levy & Coleman, Jack Levine, Philadelphia, Pa., for appellant.

Robert Keuch, Special Litigation Section, Internal Security Division, U. S. Dept. of Justice, Washington, D. C., for appellee.

Before FORMAN, ALDISERT and GIBBONS, Circuit Judges.

Before HASTIE, Chief Judge, and FORMAN,* SEITZ, VAN DUSEN, ALDISERT, ADAMS, GIBBONS and ROSENN, Circuit Judges.

OPINION OF THE COURT

ADAMS, Circuit Judge.

The primary issue raised by this appeal is whether a citizen who is summoned before a grand jury may object to questions based on information obtained through allegedly illegal and indeed unconstitutional wiretapping directed against the witness. Because of the great importance of what is at stake

---

* Judge Forman was ill at the time these opinions were filed. He may wish to file a separate opinion later.

here—not only the interpretation of provisions of the Omnibus Crime Control and Safe Streets Act dealing with unauthorized electronic surveillance, but also the Fourth Amendment—we are constrained to set forth our views in some detail.

We begin with the reminder that the basic purpose of the Fourth Amendment, recognized by countless decisions of the Supreme Court, is to safeguard the privacy and security of citizens against arbitrary invasions by governmental officials. It thus gives concrete expression to a right of the people basic to a free society.[1]

Sister Joques Egan, a member of the Order of Sacred Heart, was called before a federal grand jury in the early afternoon of January 14th in connection with an investigation into an alleged plot to kidnap a high public official and other offenses. An indictment naming six defendants had been handed down several days before, and it had named Sister Egan as an alleged co-conspirator, but not as a co-defendant.[2] Immediately following her refusal to testify on Fifth Amendment grounds, her counsel was served by the Government with an application for immunity pursuant to 18 U.S.C.A. § 6003 of the Organized Crime Control Act of 1970.

The District Court held an immediate hearing on this first immunity application. During the course of the hearing, counsel for appellant argued that the constitutionality of § 6003 was subject to serious doubt, repeatedly asked the Court for sufficient time to prepare and file a brief, and also sought an opportunity to make a motion to suppress. The Government asserted that the validity of § 6003 was assured, and that any delay

in granting the application would impede the progress of the grand jury. At the close of argument, the Court allowed counsel until the following day, January 15th, to file additional legal memoranda. The next morning, counsel argued that because the Act of 1970 provided solely for "use," as distinguished from "transactional," immunity, it was unconstitutional. The Court adjourned until January 25th. On January 25th, the Court granted the application for immunity under § 6003, and Sister Egan was directed to be available for examination the next morning, January 26th.

Contrary to the Court's instruction, and in direct reversal of the Government's announced intention, appellant was not called before the grand jury on January 26th. Instead, the Government served counsel with an application for a grant of "transactional immunity" under 18 U.S.C.A. § 2514, the Omnibus Crime Control and Safe Streets Act of 1968, stating that the Court would hear this new application "immediately."[3]

Appellant's counsel, having had the new application for only fifteen minutes, asked for adequate time to prepare to argue the applicability and the constitutionality of § 2514 of the 1968 Act. Indeed the undated authorization letter from the Assistant Attorney General was not shown to Sister Egan's counsel until all parties were in the courtroom for the hearing. The Court refused to give defense counsel the opportunity to argue the applicability of § 2514, and instead immediately signed the order granting immunity and requiring Sister Egan to appear before the grand jury forthwith. Sister Egan's counsel, together with the Government attorney, went to the Court's chambers and made additional

1. Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

2. It has been suggested that this may be a significant fact since it leaves Sister Egan subject to a charge in a public document with no right to disprove it, or to participate at the trial.

3. On January 25, 1971, Piccirillo v. New York, 400 U.S. 548, 91 S.Ct. 520, 27 L. Ed.2d 596, was decided by the Supreme Court, and on January 29, 1971, In Matter of Grand Jury Testimony of Kinoy, 326 F.Supp. 400 (S.D.N.Y.) was decided. Each of these cases raised questions regarding "use" immunity as distinguished from "transactional" immunity.

objections both to the applicability of § 2514 and the lack of adequate notice and time to prepare argument.[4]  The Court overruled all the objections made by Sister Egan's counsel, but did acknowledge the shortness of time permitted counsel to prepare for the hearing.

Before the grand jury once again, Sister Egan refused to testify on several grounds,[5] one of which is her primary contention on appeal—that the information which caused the Government to subpoena her and which prompted the questions propounded to her flowed from illegal wiretapping and electronic surveillance.

On January 26, 1971—minutes after her refusal to testify—appellant was brought back before the Court and, after being instructed to answer the questions and refusing to answer them, was held in contempt.  Appellant stated to the Court she was not being disrespectful, but that

in addition to the legal grounds already set forth her conscience compelled her not to answer.  The Court ordered that she be held in prison until she testified or until the end of the life of the grand jury.

Thereafter, on Sister Egan's application, this Court granted bail until it could decide the appeal on the merits. Without hearing further oral argument, the Court proceded on March 2, 1971 to affirm the judgment of contempt.  Sister Egan then filed a petition for rehearing, and the Court en banc heard argument on April 5, 1971.[6]

The Government did not suggest during reargument before the Court en banc, or at any time in this proceeding, that it did not employ wiretaps nor that any electronic surveillance that may have been utilized was authorized by court order.  Since Sister Egan has not yet been afforded a hearing regarding her allega-

4. No request was made by the Government, and no explanation was given for not making such request to shorten the 5-day requirement of Rules 5(a), 5(b) and 6(d) of the Federal Rules of Civil Procedure.  See In re Bart, 113 U.S. App.D.C. 54, 304 F.2d 631, 637 (1962). The Government has suggested that petitioner's appeal must fail because she has not buttressed her allegation of illegal wiretaps with substantial evidence, and because she did not file a formal motion to suppress under 18 U.S.C.A. § 2518(10) (a).  Of course, if such contentions were pressed, petitioner may well be prejudiced by the fact that the Court did not comply with the mandate of the Rules.  However, Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L. Ed.2d 176 (1969) indicates that the allegation by the complaining party that illegal wiretaps were employed may be sufficient grounds for the grant of a hearing.  Once a hearing is scheduled, petitioner has the burden proving the actual use of the illegal wiretaps.  Nardone v. United States, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L.Ed. 307 (1939).

5. (1) § 2514 was inapplicable since the Government intended to question her regarding crimes not within the authorization of § 2514;  (2) the information which caused the Government to subpoena her and which provided the basis for the questions that would be asked her

flowed from illegal wiretapping; (3) the Government intended to ask her about crimes other than the crimes of kidnapping and conspiracy to kidnap, the only crimes specified in § 2514 then being investigated; and (4) her counsel would have developed other issues if he had been afforded time to prepare.

6. The leading authority on the right of a witness held in contempt to appeal is Cobbledick v. United States, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940), in which the Court stated:
   "Whatever right he may have requires no further protection in either case than that afforded by the district court until the witness chooses to disobey and is committed for contempt. See Hale v. Henkel [201 U.S. 43, 26 S. Ct. 370, 50 L.Ed. 652], supra, and Wilson v. United States [221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771], supra.  At that point the witness' situation becomes so severed from the main proceeding as to permit an appeal.  To be sure, this too may involve an interruption of the trial or of the investigation. But not to allow this interruption would forever preclude review of the witness' claim, for his alternatives are to abandon the claim or languish in jail."
   See also Go-Bart Importing Company v. United States, 282 U.S. 344, 356, 51 S.Ct. 153, 75 L.Ed. 374 (1931).

tions of illegal electronic surveillance by the Government, for the purpose of this appeal we assume her allegations to be true.

Three primary issues are raised by this case: first, whether the procedure provided by 18 U.S.C.A. § 2518(10) (a) for the suppression of evidence derived from illegally intercepted communications is available to Sister Egan under the present circumstances; second, whether a district court may order Sister Egan to testify before a grand jury, if such testimony would violate an express congressional prohibition; third, whether Sister Egan has a constitutional right to refuse to answer questions propounded to her before a grand jury when the basis for the questions is electronic surveillance of her conducted by the Governmment in violation of the Fourth Amendment.

I

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 is applicable to the first issue raised by Sister Egan. Section 2515 of the Act, 18 U.S.C.A. § 2515, provides:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, *grand jury*, department, officer, agency, regulatory body, legislative committee, or other

authority of the United States, a State, or a political subdivision thereof, if the disclosure of that information would be in violation of this chapter." (emphasis supplied).

Section 2515 is an unequivocal bar to questioning one before a grand jury if the questions are derived from electronic surveillance conducted in the absence of a properly issued warrant and aimed at the witness, if the witness himself objects to the interrogation. See 18 U.S.C.A. § 2511, § 2516, § 2518. The prohibition of § 2515 is in accord with Congressional findings set forth in § 801 of the Act of 1968, which explain that the purpose of Title III of the Act is, inter alia, "to protect effectively the privacy of wire and oral communications" and "the integrity of court and administrative proceedings." [7]

In his dissent, Judge Gibbons interprets this view as meaning that if illegal wiretaps are used against A, then A himself is precluded from voluntarily revealing the contents of the overheard communication. We do not so read § 2511 (1) (c). Instead, we suggest that it unqualifiedly bars *the party making the illegal tap;* not the party who has been victimized—the "aggrieved party."

The Government contends, however, that although Congress in § 2515 specifically prohibited the disclosure to a grand jury of evidence derived from illegal wiretaps, nevertheless Congress excluded grand jury witnesses from availing them-

---

7. "§ 801(b).

In order *to protect effectively the privacy of wire and oral communications, to protect the integrity of court and administrative proceedings,* and to prevent the obstruction of interstate commerce, it is necessary for Congress to define on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized, to prohibit any unauthorized interception of such communications, and the use of the contents thereof in evidence in courts and administrative proceedings;

§ 801(d). To safeguard the privacy of innocent persons, the interception of wire or oral communications where none of the parties to the communication has consented to the interception should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court. Interception of wire and oral communications should further be limited to certain major types of offenses and specific categories of crime with assurances that the interception is justified and that the information obtained thereby will not be misused." (emphasis added).

selves of the remedy provided by § 2518 (10) (a). Section 2518(10) (a) states:

"Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

"(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval."

The initial requirement for the invocation of § 2518(10) (a) procedure is that the moving party be an "aggrieved person."

Section 2510(11) defines "aggrieved person" for the purpose of the Act of 1968 to mean "a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." Certainly, Sister Egan is an "aggrieved person" within the meaning of § 2510(11), because she alleges without contradiction that she "was a party to [an] intercepted wire or oral communication."

The fact that a grand jury hearing is not specifically listed in § 2518(10) (a) as a proceeding to which the section applies does not prevent Sister Egan from pursuing this statutory remedy. § 2518 (10) (a) does not indicate that the listed proceedings are exclusively the ones for which the remedy is to be exercised. And in any event, § 2518(10) (a) states that a motion by an aggrieved person to suppress may be made regarding the introduction of evidence obtained by illegal wiretapping *in "any * * * hearing, or proceeding * * * before any * * * authority of the United States."* A grand jury is empanelled and proceeds under the "authority of the United States," and thus is included in the class of proceedings to which § 2518(10) (a) is applicable. See Hale v. Henkel, 201 U.S. 43, 66, 26 S.Ct. 370, 50 L.Ed. 652 (1906); Cobbledick v. United States, 309 U.S. 323, 327, 60 S.Ct. 540, 84 L.Ed. 783 (1940). Therefore, the Act of 1968 would appear to be clear in its mandate and application to the facts of this case.

Even if the absence of the phrase "grand jury" from § 2518(10) (a) is significant, such omission would appear to be overcome by § 702 of the Organized Crime Control Act of 1970, amending title 18 by adding a new section, § 3504.[8]

In the course of contesting the right of Sister Egan to object to an interrogation

8. "§ 3504. Litigation concerning sources of evidence

"(a) In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States—

"(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act;

"(2) disclosure of information for a determination if evidence is inadmissible because it is the primary product of an unlawful act occurring prior to June 19, 1968, or because it was obtained by the exploitation of an unlawful act occurring prior to June 19, 1968, shall not be required unless such information may be relevant to a pending claim of such inadmissibility; and

"(3) no claim shall be considered that evidence of an event is inadmissible on the ground that such evidence was obtained by the exploitation of an unlawful act occurring prior to June 19, 1968, if such event occurred more than five years after such allegedly unlawful act.

"(b) As used in this section 'unlawful act' means any act the use of any electronic, mechanical, or other device (as defined in section 2510(5) of this title) in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto."

based on information obtained by wiretaps Judge Gibbons refers to Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Goldstein v. United States, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (1942); and Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). None of these cases holds that a grand jury witness may not object to questions based on illegal wiretaps directed at the witness himself. In *Jones*, the defendant objected to the introduction of evidence obtained in violation of the Fourth Amendment. Although Jones was *not* the owner of the premises that were improperly searched, he was held to have had standing to object since he was the one at whom the search was directed. In *Goldstein*, the defendant sought to object to the introduction of evidence by two witnesses, whom the defendant claimed had been induced to testify because of illegal wiretaps directed at them (substantially the same problem covered in Alderman v. United States, 394 U.S. 165, 39 S.Ct. 961, 22 L.Ed.2d 176 (1969).[9] In *Nardone*, the Supreme Court reversed a conviction because it was based in part upon evidence derived from illegal wiretaps.

To support the view that the exclusionary rule is available only to a *party* and not to a *witness* who appears before a grand jury, Judge Gibbons points to the Senate Report relating to § 2515 and emphasizes the reference in it to Walder

v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). However, *Walder* at no place indicates that a witness before a grand jury who has been aggrieved by illegal wiretaps may not take steps to exclude such information. It merely holds that a defendant may not commit perjury and then use the Fourth Amendment as "a shield against contradiction of his untruths." Such principle is in no way applicable to Sister Egan.

Ordinarily, courts do not resort to the legislative history of an act in construing a statute such as this one which is clear on its face. In construing a Congressional enactment the Supreme Court said in United States v. Oregon, 366 U.S. 643, at 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575, "Having concluded that the provisions of [the Act] are clear and unequivocal on their face, we find no need to resort to the legislative history of the Act." See also Essex County and Vicinity Dist. Council of Carpenters and Millwrights v. N. L. R. B., 332 F.2d 636, at 641 (1964). Nonetheless, it has been suggested here that the legislative history of the Act of 1968 expresses the Congressional intent more accurately than its explicit language. In particular it is contended that while admittedly Congress has forbidden evidence seized by illegal wiretaps to be used before a grand jury, nevertheless the Act's legislative history reveals that Congress did not intend to permit the remedy provided by § 2518(10) (a) to be raised by a grand jury witness.[10]

9. In Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939), a case which arose from the same transaction as *Goldstein*, the Supreme Court, in an opinion by Justice Roberts, reversed a conviction because a witness to a conversation which had been wiretapped was permitted to testify against the defendant with the aid of the wiretapped material.

10. "Paragraph (10) (a) provides that any aggrieved persons, as defined in section 2510(11), discussed above, in any trial hearing or other proceeding in or before any court, department, officer, agency, regulatory body or other authority of the United States, a State, or a political sub-

division of a State may make a motion to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom. This provision must be read in connection with sections 2515 and 2517, discussed above, which it limits. It provides the remedy for the right created by section 2515. Because no person is a party or such to a grand jury proceeding, the provision does not envision the making of a motion to suppress in the context of such a proceeding itself. Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforcible by an individual. (United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d

We do not believe the legislative history is dispositive of the question whether Sister Egan may proceed pursuant to § 2518(10) (a) to secure a hearing regarding her allegation of illegal wiretaps. The legislative history is, to say the least, ambiguous.

The reference to United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1965) and the expressed intention not to change the rule contained in *Blue* raise serious questions as to the meaning of the legislative history. The holding of *Blue* relevant to the present issue was merely that if the Government had submitted to a grand jury evidence obtained in violation of the Fifth Amendment, by itself such action did not entitle Blue *to have an indictment dismissed.* The rationale underlying *Blue,* as expressed by Justice Harlan, is that the exclusionary rule interdicts the use of tainted evidence, but "does not extend to barring the prosecution altogether." 384 at 255, 86 S.Ct. at 1419.[11] *But see* United States v. Tane, 329 F.2d 848 (2nd Cir. 1964).

Sister Egan, of course, is not attempting to have an indictment dismissed. Her complaint, unlike that of *Blue,* is that she has been called to testify before the grand jury as a result of the Government's improper wiretaps, and that had it not been for such wiretaps the Government would not be seeking to interrogate her. It is the grand jury's questioning itself which will create the harm of which she complains. In view of the express provision of § 2515 forbidding the use before a grand jury of the fruits of illegal wiretaps, it is highly unlikely that Congress intended to exclude grand jury witnesses who are also aggrieved persons within the meaning of the Act from the procedural remedy provided by § 2518(10) (a). The reference in the legislative history to *Blue* demonstrates at most a congressional intent to preclude an attack on a grand jury investigation by one whose interest in such investigation is not as a witness, but as a defendant, and instead to require such person to move for the exclusion of the questionable evidence after the indictment or at a time designated by the rules of criminal procedure.[12]

Thus, when Congress stated that there was no intent to change the general rule contained in *Blue,* it was expressing a purpose not to alter the principle that Fifth Amendment grounds are an insufficient basis to *quash an indictment.* The context of the present case is substantially different from that of *Blue,* because Sister Egan is complaining of violations of her Fourth Amendment right, a right significantly different from that set forth in the Fifth Amendment.[13] She is not attempting to block

510 (1965)). There is no intent to change this general rule. It is the intent of the provision only that when a motion to suppress is granted in another context, its scope may include use in a future grand jury proceeding." S.Rep.No. 1097, 90th Cong. 2nd Sess. (1968), U.S. Code Cong. & Ad. News, pp. 2112, 2195.

11. See a further discussion of United States v. Blue, at pp. 210–211 *infra.*

12. See Rule 41(e) Fed.R.Crim.Pro.

13. Fourth Amendment
   *"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,* and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (emphasis supplied).

Fifth Amendment
   "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb, nor shall be compelled in any criminal case to be a witness against himself; nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

an indictment that might be returned by the grand jury but rather is asserting her right as a citizen to vindicate her privilege which protects her from unreasonable searches and seizures, regardless whether she will ever be indicted.

The sentence which appears before the *Blue* citation in the legislative history— *"Normally,* there is no limitation on the character of evidence that may be presented to a grand jury, which is enforcible by an individual." [14]—implies that Congress recognized there might be exceptions to the general rule. Indeed, in certain circumstances where the compulsion of testimony in a grand jury proceeding would violate a constitutional statutory, or common law privilege of the grand jury witness, there are numerous precedents for permitting a witness to invoke the protections afforded by such privileges. E. g., Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); Blau v. United States, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951); Silverthorne Lumber Company v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); Dionisio v. United States, 442 F.2d 276 (7th Cir. 1971); Caldwell v. United States, 434 F.2d 1081 (9th Cir. 1970), cert. granted, 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109 (1971). Although Congress expressed an intention to adhere to the "general rule," there is no basis for believing that it was excluding the usual exceptions to the general rule.

Blau v. United States, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951) is especially appropriate in this regard. There, the petitioner was called before a grand jury investigating the activities of the Colorado Communist Party. When questioned regarding the whereabouts of his wife, Blau refused to answer, relying solely upon the privilege attaching to confidential communications between husband and wife. The district court, despite the assertion of the husband-wife privilege, sentenced Blau for contempt. The Supreme Court reversed on the ground that the husband-wife privilege shielded Blau from disclosing what was presumed to be a confidential communication from his wife. If a common law doctrine may support a grand jury witness's refusal to testify, it follows that an express statutory prohibition would require a similar result. Since Sister Egan was a party to the conversations monitored illegally, she has a personal interest in refusing to answer questions derived from the Government's illegal invasion of her privacy.

In short, while the legislative history regarding 2518(10) (a) is not completely clear, it appears to indicate an intent that one who has been illegally wiretapped but is not a witness called by the grand jury may not move to suppress; and that even a witness or defendant who objects to the use of illegal wiretaps in the proceedings may not move to quash the entire proceeding of even an indictment growing out of it.

The dissent takes the position that footnote 9 of Alderman v. United States, 394 U.S. 165, 175, 89 S.Ct. 961, 22 L.Ed. 2d 176 (1969) demonstrates that the Supreme Court views the remedy provided by § 2518(10) (a) of the Act of 1968 as inapplicable to the circumstances of this case. Indeed, one of the main contentions in this case has been that footnote 9 of *Alderman* clearly indicates that § 2518(10) (a) does not confer standing upon one who is hailed before a grand jury and questioned on the basis of material obtained from the witness himself as a result of improper eavesdropping.

To understand more fully the implication of footnote 9, it is appropriate to review *Alderman.* The defendant there was convicted of a conspiracy to transmit threats in interstate commerce. Thereafter, he claimed he discovered that the evidence used to convict him was obtained as a result of illegal eavesdropping and petitioned the Supreme Court to remand the case so that the district court might hold a hearing to determine whether the surveillance was illegal and

14. (emphasis added).

if so, whether the evidence introduced at his trial was so tainted as to vitiate the conviction. The Solicitor General conceded that wiretapping had been employed, but contended that no hearing was necessary because none of the conversations overheard was arguably relevant.

The Supreme Court held (1) that it could not rely on the representations of the Solicitor General regarding the relevancy of the material obtained by the wiretaps, but (2) that the "established principle is that suppression of the product of a Fourth Amendment violation *could be successfully urged only by those whose rights were violated by the search itself,* not by those who are aggrieved solely by the introduction of damaging evidence" (emphasis supplied). 394 U.S. at 171–172, 89 S.Ct. at 965. Thus, the case was remanded for a district court hearing.

In the course of examining the proposition that Fourth Amendment protection *is available only to the one whose personal rights have been violated,* and not available to a third party, Justice White said:

"Of course, Congress or state legislatures may extend the exclusionary rule and provide that illegally seized evidence is inadmissible against anyone for any purpose." [9] 394 U.S. at 175, 89 S.Ct. at 967–968.

Footnote 9 of Alderman reads as follows:

"9. Congress has not done so. In its recent wiretapping and eavesdropping legislation, Congress has provided only that an 'aggrieved person' may move to suppress the contents of a wire or oral communication intercepted in violation of the Act. Title III, Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 221 (18 U.S.C. § 2518(10) (a) 1964 ed., Supp. IV). The Act's legislative history indicates that 'aggrieved person,' the limiting phrase currently found in Fed.Rule Crim.Proc. 41(e), should be construed in accordance with existent standing rules. See S.Rep., No. 1097, 90th Cong., 2d Sess., at 91, 106."

Fed.Rules Crim.Proc. 41(e), referred to in footnote 9 of *Alderman,* provides as follows:

(e) Motion for Return of Property and to Suppress Evidence. A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property and to suppress for use as evidence anything so obtained on the ground that (1) the property was illegally seized without warrant, or (2) the warrant is insufficient on its face, or (3) the property seized is not that described in the warrant, or (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued, or (5) the warrant was illegally executed. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored unless otherwise subject to lawful detention and it shall not be admissible in evidence at any hearing or trial. The motion to suppress evidence may also be made in the district where the trial is to be had. The motion shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing.

In view of the language of Rule 41(e), it seems clear that what Justice White is saying is that in a criminal trial—such as *Alderman*—the defendant may object only if the illegal search was directed at him. If it was directed at a third party, however, such third party may protect himself, if he desires, by moving under Rule 41(e). In Grant v. United States, 282 F.2d 165, 168 (2nd Cir. 1960), IRS agents obtained from two physicians records and papers relating to income tax matters. Fearing that these records might lead to a grand jury investigation, the physicians moved, prior to indict-

ment, under Rule 41(e) for the suppression of the documents. The District Court directed the Government to show cause why the physicians were not entitled to the return of their documents. The Government appealed and the Second Circuit stated that Rule 41(e) may be invoked by a citizen who has not been indicted and is not a party to a criminal proceeding. Judge Friendly, speaking for the Court, said:

> "The classical exposition of the nature of [a rule 41(e) motion] is Judge Hough's statement in United States v. Maresca, 266 F. 713, 717 (S.D.N.Y. 1920):
>
> "Whenever an officer of the court has in his possession or under his control books or papers, or (by parity of reasoning) any other articles in which the court has official interest, and of which any person (whether party to a pending litigation or not) has been unlawfully deprived, that person may petition the court for restitution. This I take to be an elementary principle, depending upon the inherent disciplinary power of any court of record.
>
> "Attorneys are officers of the court, and the United States attorney does not by taking office escape from this species of professional discipline. Thus power to entertain this motion depends on the fact that the party proceeded against is an attorney, not that he is an official known as the United States Attorney. It is further true that the right to move does not at all depend on the existence of this indictment; it might be made, were no prosecution pending." [15]

Likewise in Centracchio v. Garrity, 198 F.2d 382 (1st Cir.), cert. denied, 344 U.S. 866, 73 S.Ct. 108, 97 L.Ed. 672 (1952), a petitioner, although not indicted at the time of his motion, moved under Rule 41(e) to suppress information he had volunteered to the Treasury Department, alleging the use of such information by the Government violated the Fifth Amendment. The District Court entertained the motion but denied the petition on the merits, finding that no violation of Centracchio's constitutional rights had occurred. The First Circuit held that the denial of the motion was appealable, because the motion was an independent proceeding and not "in the course of a criminal proceeding, since [n]o such proceeding was pending before the district court." The Court stated:

> " * * * it has long been accepted that where evidence, obtained by an unconstitutional search and seizure in violation of the Fourth Amendment, is in the hands of a United States Attorney, a *federal district court may entertain and grant relief on a petition, filed even prior to any indictment,* seeking a return of the papers or property unconstitutionally seized and the suppression of the same as evidence." 198 F.2d at 385–386.

The Court went on to note that Centracchio's petition and the evidence supporting it "did not disclose that petitioner had yet suffered any violation of his constitutional rights, either under the Fourth or Fifth Amendment." 198 F. 2d at 388. For that reason and because Centracchio would be able to raise his

---

15. Other cases deciding that a Rule 41(e) motion is available to a victim of an unconstitutional search when such person is not a defendant and indeed not even a witness are: United States v. Foley, 283 F.2d 582 (2nd Cir. 1960) (companion case to Grant v. United States, *supra*); United States v. Bell, 120 F.Supp. 670 (D.D.C.1954). See also Rodgers v. United States, 158 F.Supp. 670 (S.D.Cal. 1958), and cases cited therein. Before the adoption of Rule 41(e) in 1946, the Supreme Court, in Go-Bart Importing Company v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931), unanimously held that victims of illegal searches who were not defendants and not parties to any criminal proceedings may move to suppress. (But see DiBella v. United States, 369 U.S. 121, 131, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962) on question of appealability when there is a motion to suppress prior to indictment).

Fifth Amendment rights at trial,[15a] the Court decided that the petition before it lacked equity and should have been dismissed.

Centracchio, therefore, supports the proposition that district courts do have jurisdiction under Rule 41(e) to hear and decide pre-indictment motions seeking to suppress evidence seized in violation of the Fourth Amendment. The equitable considerations upon which the *Centracchio* court based its decision are not present here: Sister Egan's allegations on their face reveal a Fourth Amendment violation; and unlike Centracchio Sister Egan by virtue of the Government's grant of immunity is unlikely to become a criminal defendant and thus will not be able to vindicate her rights in a future criminal proceeding.

Considered in light of the issues decided in *Alderman,* footnote 9 means that the Safe Streets Act of 1968 did not adopt a definition of "aggrieved person" broader than constitutionally required. Since *Alderman* decided that the Fourth Amendment creates rights that may be vindicated only by the one who suffered a search and seizure conducted in violation of the Fourth Amendment, the definition of "aggrieved person" in the Act of 1968 is in accord with constitutional standards set forth in *Alderman.* In any event because Sister Egan alleges that her rights under the Act were violated by an illegal wiretap addressed directly to conversations to which she was a party, she falls within the definition of "aggrieved person" under the Act, and whatever judicial interpretation of the Act exists in footnote 9 of *Alderman* is not inconsistent with this view of the Act. Indeed, footnote 9 supports such an interpretation.

## II

■ Assuming *arguendo* that the Government is correct that the procedure provided by § 2518(10) (a) is inapplicable to this case, there is nonetheless a second ground requiring reversal. It seems beyond question that a district court may not compel the violation of an express congressional prohibition. Section 2515 of the Act directly and clearly forbids the presentation to a grand jury of evidence derived from the contents of oral communications improperly obtained. The Government does not except to such position.

As pointed out previously, § 801 indicates that one of the Act's purposes is to protect "the privacy of wire * * * communications" and "to protect the integrity of court[s] by forbidding the contents of such conversations from being introduced into evidence. In order to effectuate the legislative purpose, Congress prohibited not only the introduction of the contents of conversations illegally obtained, but also any evidence derived therefrom. Such a rule has a two-fold effect—to protect the courts from becoming unwilling participants in illegal governmental activity, and to protect the privacy of citizens. In framing the legislation in question, Congress adopted a traditional judicial approach to Fourth Amendment problems—a prohibition against the use of evidence seized in violation of the Amendment, and also a prohibition against the use of evidence acquired by the Government as a result of the inhibited conduct.

■ In the present case the District Court had a duty to follow the express direction of Congress found in § 2515. By ordering ·Sister Egan to testify before the grand jury when Congress has legislated the exclusion of such evidence, the District Court simply acted inconsistently with the legislative mandate.

The rule provided by § 2515 is the legislative parallel of prior judicial decisions holding that the federal courts should not receive evidence obtained in violation of federal statutes. 47 U.S. C.A. § 605 prohibits the publication of the contents of illegally intercepted wire communications and thus, in many re-

---

15a. Centracchio was in fact indicted in the interval between the district court's order and the decision of the court of appeals.

spects, is similar to § 2511(1) (c) of the Omnibus Crime Control Act. In Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937), the defendants were convicted by evidence which included a federal agent's testimony of statements made by the defendants in telephone conversations which had been intercepted by wiretaps. Since § 605 provides that "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person * * *," the Court ruled that it was impermissible to receive into evidence the testimony of the federal agent relating to the overheard telephone conversations. The statute in the present case is a stronger one than that considered in *Nardone,* because § 605 did not specifically prohibit the use of the contents of intercepted telephone communications in a criminal proceeding, whereas § 2515 expressly creates a rule of evidence relevant to criminal proceedings.

The fact that Sister Egan has been granted § 2514 immunity does not deprive her of standing to raise § 2515 as a defense to a proposed judgment of civil contempt, because she is not complaining of Fifth Amendment violations, but rather of Fourth Amendment ones. Surely, even though Sister Egan has been offered immunity from prosecution, she continues to have a substantial interest in preventing the Government from compounding its original violation of her privacy by forcing her to answer questions that would concededly not be asked absent the information discovered through the use of unwarranted wiretaps.

## III

Finally, even if Sister Egan has no *statutory* defenses to the judgment of civil contempt, the Fourth Amendment would require that the case be remanded to the District Court for a hearing regarding her allegations that the grand jury questions in this case are the fruits of unconstitutional electronic surveillance.

The Government argues that in the context of a constitutional defense to the District Court's order to testify before the grand jury, Sister Egan is without standing to challenge the lawfulness of the Government's acquisition of information by wiretaps placed on her telephone. As the Supreme Court recently stated, "[standing] concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Association of Data Processing Service Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).[16] See Investment Co. Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). Ordinarily a citizen has standing to complain of a violation of Fourth Amendment rights when an illegal search and seizure has been directed against him. Alderman v. United States, supra; Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); See Greenspan and White, Standing to Object to Search and Seizure, 118 U.Pa.L. Rev. 333 (1970). The fact that the question of standing arises in a grand jury investigation does not alter the result.[17]

16. Although *Association of Data Processing Service Orgs.* concerned standing to challenge the action of an administrative agency, nonetheless the opinion enunciates a concept which is at least helpful in deciding the present question.

17. In the original opinion filed by the panel (March 2, 1971), the question of standing by a grand jury witness was specifically addressed: "Frankly, appel-

lant as a witness before the grand jury lacks standing to litigate the issue of illegal wiretaps and surveillance in the collection of evidence against him. * *" The Government in its brief squarely raised the point and elaborated on it at oral argument. In his dissenting opinion, Judge Gibbons expressed the view for the first time that this proposition is a "nonissue," and that a witness can create a

The leading case in this field is Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), which included a number of elements similar to those arising here. Frederick and Asa Silverthorne as well as the Silverthorne Company were indicted for conspiracy to defraud the Government by obtaining payment for materials not delivered. Thereafter, papers belonging to Frederick Silverthorne and to the Silverthorne Company were seized in violation of the Fourth Amendment rights of the corporation and the individual, and subsequently returned to the owners only after a petition had been filed by them. Then a grand jury issued a subpoena duces tecum for the production of the very papers previously seized. The Company and Frederick Silverthorne refused to obey the subpoena on the ground that it was based on the poisonous fruits of the improper search and seizure. The district court held both the Company and Frederick Silverthorne in civil contempt. On writ of error to the Supreme Court the judgment of contempt was reversed. Justice Holmes, writing for the Court, stated that grand jury witnesses may not constitutionally be held in contempt for failing to respond to a subpoena when the Government " * * * seeks to maintain its right to avail itself of the knowledge obtained by that means which otherwise it would not have had." 251 U.S. at 391, 40 S.Ct. at 182. And thus in Silverthorne the corporation and Frederick Silverthorne were permitted to challenge a judgment of contempt for failing to respond to a subpoena issued by a grand jury, irrespective of the eventual action of the grand jury and without regard to whether they ultimately would be brought to trial. The Court in Silverthorne did not require that the petitioners defer challenging the Government's

seizure of information until such time as they would be tried. The rationale for Silverthorne, in the words of Mr. Justice Holmes, is that "[t]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used [by the Government] at all." (emphasis supplied) 251 U.S. at 392, 40 S.Ct. at 183. This language would logically appear to mean that the Fourth Amendment prevents the Government from using illegally seized evidence as the basis for questioning aggrieved parties before a grand jury.[18] As we understand the holding of Silverthorne it would appear to control the issue raised by Sister Egan. Furthermore, the resolute language contained in Silverthorne has been frequently reasserted by the Supreme Court. Indeed, as late as 1968, although in a context somewhat different from that now present, the Court referred to Silverthorne and reaffirmed the reasoning which Sister Egan applies to her case. Harrison v. United States, 392 U.S. 219, 222, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

The Government insists that Silverthorne is distinguishable from the present case because Sister Egan has been granted "transactional" immunity, and the defendants in Silverthorne did not receive such protection. There are a number of answers to this contention. First, as previously indicated, the language of Silverthorne established a broad prohibition against the Government's obtaining information as a result of conduct violative of the Fourth Amendment. The Supreme Court did not adumbrate in any way the distinctions suggested by the Government here. Second, one of the petitioners was a corporation, and therefore not protected by the Fifth Amendment. Thus, in one

---

case or controversy to test the existence of a witness privilege by standing in contempt.

18. Because Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576

(1967), extended the reach of the Fourth Amendment to prohibit unreasonable electronic surveillance, whether involving a trespass or not, the holding of Silverthorne is applicable to the present case.

sense Sister Egan and the Silverthorne Company are in a similar posture since neither was entitled to complain of Fifth Amendment violations—she because of her immunity. Third, the fact that Sister Egan has been offered "transactional" immunity regarding her testimony before the grand jury does not dissipate the harm which she has suffered as a direct result of the illegal wiretaps and the Government's attempt to question her based on them. Fourth, the fact that there were indictments in *Silverthorne* actually makes Sister Egan's case a stronger one for permitting the attack on the subpoena at this point, since this is the only time Sister Egan may have the opportunity to move to vindicate her constitutional right to privacy.

The Government also contends that normally there is no limitation on evidence that may be presented to a grand jury which may be enforced by an individual witness, and that this is but another way of saying that a witness before the grand jury has no standing to object to what evidence is adduced before the grand jury. For this proposition, the Government refers to United States v. Blue, *supra.* However, the reliance is misplaced.

In *Blue,* the defendant was indicted for evading income taxes. Prior to indictment, the Government had filed jeopardy assessments against Blue's property, and Blue filed petitions to remove them. Blue thereafter moved to dismiss the indictment on the ground that the petitions to reverse the jeopardy assessments required him to make statements which would incriminate him in the criminal proceedings in violation of his Fifth Amendment rights. The district court granted Blue's petition, and the Supreme Court took jurisdiction since the district court's judgment was in effect a motion in bar and future prosecution of Blue would be forever prevented. The Supreme Court reversed on the ground that Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be used

against him at a criminal trial, stating (384 U.S. at 255, 86 S.Ct. at 1419):

"* * * this Court in a number of areas has recognized or developed exclusionary rules where evidence has been gained in violation of the accused's rights under the Constitution, federal statutes, or federal rules of procedure. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760; Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307; Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. *Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether."* (emphasis added).

*Blue* is clearly inapposite here. Blue had been indicted, and the thrust of his complaint was not that his privacy was invaded or indeed that his constitutional rights had been infringed, but only that if the Government proceeded to prosecute him, he could then assert his Fifth Amendment right and therefore the indictment should be quashed. In a footnote, the Court specifically pointed out that it is not even "contended that tainted evidence was presented to the grand jury." 384 U.S. at 255, 86 S.Ct. at 1419. Accordingly, it was clear that Blue had to await trial before properly moving to suppress the evidence to which he objected. Finally, it was the Fifth Amendment and not the Fourth that was invoked in *Blue.* The very language of the Fourth Amendment demonstrates that its reach is far broader than that of the Fifth.

The Government places great stress on the fact that Sister Egan has received immunity. However, this fact does not answer the constitutional issue that has been raised. Sister Egan states that if she has a constitutional right not to have her privacy invaded by illegal wiretaps, it is an inadequate response for the Gov-

ernment to say in effect, we may have invaded your privacy but we will not prosecute you as a result of our misconduct, and thus you have no standing to complain of the invasion of your privacy.[19] The Government's answer is really a nonsequitur, and the Government does not come to grips with the fact that Sister Egan's constitutionally protected right of privacy has been invaded. Instead, a careful analysis of the Government's position demonstrates that it deals solely with her right not to be compelled to incriminate herself as being satisfied by the immunity which has been granted. Immunity deals with the witness' privilege not to incriminate himself. The witness still has the right that his person and home not be improperly searched and if it is, under principles now well settled, the fruits of such search may not be used.

If the Government were correct in its approach, numerous citizens could have their privacy invaded by wiretaps and be brought before a grand jury for questioning regarding the fruits of such wiretaps. Under the logic of the Government's contention regarding standing if the Government were to file an application for immunity, the right of such citizens to be free from questions based on the illegal wiretaps would be placed beyond the reach of judicial review. We do not believe that the command of the Fourth Amendment can be so easily circumvented.[20]

The Government argues that notwithstanding *Silverthorne,* two circuits, the Second and the Ninth, have ruled that a grand jury witness may not challenge the source of information supporting the grand jury's decision to question the witness: Carter v. United States, 417 F.2d 384 (9th Cir. 1969); United States ex rel. Rosado v. Flood, 394 F.2d 139 (2nd Cir. 1968).

In *Carter,* the Ninth Circuit considered an appeal from an order of a district court requiring members of the Black Panther Party who had been granted "transactional" immunity to testify before a grand jury. One of the contentions concerned the appellants' belief that some of the questions propounded by the grand jury were based upon information stemming from illegal wiretaps directed against a third party. Although the Court stated, "As [grand jury] witnesses, they have no standing to question the source of the government's information," 417 F.2d at 388, such broad language was unnecessary because the decision could have been based on the ground, as in Alderman v. United States, that a citizen may not vicariously raise the Fourth Amendment rights of a third party. Since appellants in *Carter* were attempting to assert on their own behalf the protections afforded by the Fourth Amendment to a third party who was the victim of illegal wiretaps, *Carter* is distinguishable from Sister Egan's case; Sister Egan has asserted that she, personally, was the victim of unconstitutional surveillance. To the extent the language of *Carter* controls the present case, we should decline to follow it as it is in conflict with *Silverthorne.* Subsequent to *Carter,* the Ninth Circuit, in Caldwell v. United States, 434 F.2d 1081 (1970) cert. granted 402 U.S. 942, 91 S. Ct. 1616, 29 L.Ed.2d 109 (1971) reserved decision on the issue whether a grand jury witness is entitled to an *Alderman* hearing when he alleges his grand jury subpoena was based upon information obtained in violation of the Fourth

19. As Justice Frankfurter said in Wolf v. Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949) : "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society."

20. Counsel for the Government suggested at oral argument that a witness before a grand jury who has had her telephone illegally wiretapped may have a civil cause of action against the wrongdoer, and obtain a verdict for each day such wires were tapped. The courts have frequently stated that money damages may not be considered complete restitution for one who has had his constitutional rights infringed.

Amendment. Thus, in the view of the *Caldwell* panel, this issue, notwithstanding *Carter,* remains unresolved in the Ninth Circuit.[21]

*Caldwell* makes it clear that a grand jury witness does have standing to challenge a grand jury subpoena on the ground that the compulsion to testify would encroach upon a constitutional right—in *Caldwell* the protection of the First Amendment. Caldwell, a reporter who had interviewed Black Panther Party members, was subpoenaed to testify before a federal grand jury. Because he feared that to appear would hinder his effectiveness as a reporter, Caldwell moved to quash the subpoena as violative of the First Amendment's guarantee of freedom of the press. The District Court refused to quash the subpoena, but recognizing the importance of the First Amendment question ordered that Caldwell need not reveal to the grand jury confidential information received in his professional capacity. Despite the order, Caldwell refused to obey the subpoena on the ground his mere appearance before a grand jury would intimidate potential sources of information who wished to remain anonymous. Caldwell was held in contempt. The Ninth Circuit ruled that the order fashioned by the District Court was insufficient to satisfy the requirements of the First Amendment and reversed, holding that where a grand jury subpoena would jeopardize freedom of the press, the Government must demonstrate a "compelling need for the witness's presence before judicial process properly can issue to require attendance." 434 F.2d at 1089.

In *Rosado,* a case relied upon as support for the sweeping language contained in *Carter,* the Second Circuit considered a habeas corpus petition brought by a state prisoner who had been confined for refusing to answer questions before a New York grand jury, despite a grant of immunity under New York law. Rosado contended that compelling him to answer questions concerning the contents of intercepted telephone conversations to which he had been a party would violate 47 U.S.C.A. § 605 and the Federal Constitution. Regarding Rosado's claims, the court primarily relied upon Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919). *Blair* involved a grand jury investigating violations of the Corrupt Practices Act. Three of the witnesses called before the grand jury refused to testify on the ground the Corrupt Practices Act was unconstitutional because it attempted to regulate selection by political parties of candidates for the Senate. The Supreme Court ruled that as mere witnesses they were without standing to challenge the validity of a statute, the violation of which was the subject of the grand jury investigation. The Supreme Court reasoned that the witnesses, as distinguished from future defendants, had insufficient interest in the constitutionality of a statute to require the Court to overcome its reluctance to pass upon the validity of an act of Congress. However, the Supreme Court was careful to point out that there were cases in which a witness before a grand jury could assert rights not to testify. It stated that:

> "The duty [to testify before a grand jury] * * * is subject to mitigation in exceptional circumstances; there is a constitutional exemption from being compelled in any criminal case to be a witness against oneself, entitling the witness to be excused from answering anything that will tend to incriminate him * * *; some confidential matters are shielded from considerations of policy, and perhaps in other cases for special reasons a witness may be excused from telling all that he knows." 250 U.S. at 281, 39 S.Ct. at 471.

---

21. At oral argument here, the Government suggested that United States v. Weinberg, 436 F.2d 416 (9th Cir. filed Jan. 28, 1971) had decided the question reserved in *Caldwell.* However, *Weinberg* is inapposite since the Fourth Amendment issue considered in *Weinberg* was whether a grand jury subpoena must be supported by probable cause.

Hence, on analysis, the holding of *Blair* would appear to be a narrow one, deciding only that a grand jury witness may not challenge the constitutionality of a statute the alleged violation of which is the subject of a grand jury inquiry. Since the Supreme Court in *Blair* was careful to point out that grand jury witnesses do have standing to litigate some privileges, such as the Fifth Amendment, we respectfully suggest that the *Rosado* panel read the holding in *Blair* too broadly. Indeed, cases far more recent than *Blair* have held that grand jury witnesses have the requisite standing to raise a variety of privileges. E. g. Blau v. United States, *supra;* Caldwell v. United States, *supra;* Dionisio v. United States, *supra;* In re Bonanno, 344 F.2d 830 (2nd Cir. 1965). But see United States ex rel. Ciffo v. McClosky, 272 F.Supp. 604 (S.D.N.Y.1967).

Furthermore, to some extent *Rosado* is distinguishable from the present case because *Rosado* implicated a witness called before a *state* grand jury, while Sister Egan is before a *federal* grand jury. Federal courts have traditionally exhibited a reluctance to interfere with state criminal proceedings. *Compare* Schwartz v. Texas, 344 U.S. 199, 73 S.Ct. 232, 97 L.Ed. 231, *with* Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937); see Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L. Ed.2d 669 (1971). Insofar as *Rosado* is not distinguishable on the basis that the holding there stems from a reluctance of federal courts to upset the delicate balance of federal-state relations, we should decline to follow it because it would appear *Rosado* misapplied the teaching in *Blair* and also is in conflict with *Silverthorne.*

It is appropriate at this point to repeat a statement by Chief Judge Lumbard—a year after *Rosado*—in Bivins v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 409 F.2d 718, 724 (2nd Cir. 1969), cert. granted, 399 U.S. 905, 90 S.Ct. 2203, 26 L.Ed.2d 559 (1970):

> " * * * the primary thrust of the Bill of Rights is to shield citizens from certain actions by the government. The implication of judicial remedies to provide this shield follows naturally from the declaration of a right * * ".

Sister Egan's right to be free from unreasonable searches has already been violated as a result of the Government's use of illegal wiretaps. The Government now seeks to profit from its unconstitutional conduct by propounding questions based on the improperly seized information. To deprive Sister Egan of a shield to ward off such activity would seriously rend the armor of the Fourth Amendment.[22]

The Government has suggested that to permit Sister Egan to require a hearing to determine whether she has been the victim of illegal surveillance merely by alleging that the questions were derived from such wiretaps would unreasonably impede the progress of the grand jury investigation. However, there are precedents for such a procedure, some of them involving common law as well as constitutional or statutory rights. For example, the Second Circuit in In re Bonanno, *supra,* decided that the attorney-client privilege protects a grand jury witness from being forced to reveal conversations between himself and his attorney. Furthermore, the Second Circuit held that as a consequence of the protection afforded a grand jury witness, before imposing a judgment of contempt the District Court should conduct a hearing to determine whether the requisite attorney-client relationship did in fact exist at the time of the conversations in question. Likewise, in Blau v. United States, *supra,* a communication between a husband and wife was held presump-

---

22. Concern regarding the grave threat to Fourth Amendment rights posed by the development of techniques of electronic surveillance is fully supported by Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). For a comprehensive report of the techniques of electronic surveillance, see Dash, Knowlton, Schwartz, The Eavesdroppers (1959).

tively privileged and beyond grand jury inquiry. The Court indicated that the Government might be able to overcome the presumption of confidentiality attaching to communications between husband and wife, and, of course, any such attempt would require a hearing.[23]

In the context of electronic surveillance, it is unlikely that hearings such as requested here would become a major interference with efficient grand jury investigations. Sister Egan is not asking that the grand jury be prevented from continuing its investigations or from returning an indictment against anyone found to have violated federal law. In fact the grand jury which has so far been unable to have the benefit of Sister Egan's testimony has already returned various indictments relating to the questions posed to Sister Egan.

We assume that the Government will attempt to conduct surveillance within statutory and constitutional limits, and that only in a slight number of cases will there be a violation of the rules governing wiretapping. Thus, when the allegation of illegal surveillance is made in most cases the Government will simply represent to the court that no electronic surveillance has been employed by the Government. In a lesser number of cases the Government will produce in court the warrant by which it proceeded, and a brief inquiry will demonstrate that the warrant was properly obtained and that the surveillance did not exceed the authority of the warrant. Only in a minimal number of cases do we expect that the Government will be found to have conducted surveillance in violation of the statute and in these cases the hearing will not be overly complicated or lengthy, because the primary matter of inquiry would be whether the Government can demonstrate an independent basis, aside from the illegal surveillance, upon which to justify the questions propounded before the grand jury.

Certainly the possibility that some grand jury witnesses may seek *Alderman* hearings is not sufficient to cause a curtailment of an important right such as provided by the Fourth Amendment.[24] And this is all the more so when the Government—which would have the bur-

---

23. In his dissenting opinion, Judge Gibbons points out that for centuries the public has had the right to compel citizens to testify in court proceedings and that the privilege or right of such citizens not to testify is in derogation of their duty to produce evidence in legal proceedings. With this proposition, we have no quarrel. Despite this salutary precept it is not disputable that over the generations there have developed—as a result of the commands of the Constitution, laws passed by the Congress, and rules enunciated by the Court—exceptions to this concept of the duty to testify. Thus, few would deny that where evidence is improperly obtained from a defendant, it may not be used· to convict him. And no one would dispute the fact that where a witness properly invokes his rights under the Fifth Amendment, he may not be compelled to testify. Yet in such situations, the result of these privileges against the production of evidence will frequently cause defendants to be freed who might otherwise be convicted.

The refusal of witnesses to testify because of Fifth Amendment reasons or other privileges such as attorney-client or physician-patient, may affect results in civil as well as criminal trials. Yet, these exclusionary situations based on privileged communications have prevailed for hundreds of years.

24. As Justice Jackson stated in Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) :

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. * * The right of officers to thrust themselves into a home is * * * a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."

den of proof in attempting to dull the edges of a constitutional right—has shown absolutely no evidence to support the proposition that standing to assert a Fourth Amendment right will disrupt the grand jury procedure.

The dissenters suggest that since there is no statistical evidence available indicating the degree to which federal agents might employ illegal wiretaps, considerations favoring evidentiary sanctions may not exist, and there is no basis for using the exclusionary rule. In support of this proposition Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) and Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) are cited. It is true that in *Mapp,* which applied the exclusionary rule to the states, the Court did demonstrate that state officers had not been complying with the Fourth Amendment rules. In Weeks, however, where the Court was dealing with the federal system—as we do here—no empirical study was employed to support the application of the exclusionary rule. Instead, Justice Day stated, 232 U.S. at 391–393, 34 S.Ct. at 344:

> "The effect of the 4th Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers, and effects, against all unreasonable searches and seizures under the guise of law."
>
> \* \* \* \* \* \* \*
>
> "If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th Amendment, declaring his right to be secure against such searches and sei-

zures, is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land."

Finally, we must be ever mindful of the admonition that in a government of laws, the very existence of the Government will be imperiled if it fails to observe the law scrupulously. For the Government teaches the whole people by its example, and if the Government becomes a law breaker, it breeds contempt for law. To declare that the Government may commit crimes in order to secure the conviction of a criminal may well bring unfortunate retribution.[25]

HASTIE, Chief Judge, joins in the opinion.

SEITZ, Circuit Judge, concurs in the result based on Part II of this opinion.

VAN DUSEN, Circuit Judge, concurs in Part II of this opinion only, since he believes that courts should avoid decision of constitutional questions wherever possible, and should ordinarily decide cases on the narrowest possible ground.

ROSENN, Circuit Judge, in addition to filing a separate concurring opinion, joins in Part II of this opinion.

In view of the positions of the judges constituting the majority, the judgment of contempt will be vacated and the case remanded for a hearing to determine whether the questions propounded to Sister Egan resulted from illegal electronic surveillance directed at her.[26]

---

25. See Brandeis' dissent in Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928), cited with approval in Elkins v. United States, 364 U.S. 206, 223, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

26. A number of additional issues were raised by appellant. These include the questions whether the authorization by the Attorney General and the United States Attorney was in conformity with the Statute, whether the second immunity

ROSENN, Circuit Judge (concurring):

Because Congress, by enacting the Omnibus Crime Control and Safe Streets Act of 1968, prohibited any unauthorized interception of wire and oral communications and made unlawful the use of the contents thereof in courts and administrative agencies, I believe that a proper disposition of this case may be made without reaching the constitutional issue raised by the appellant.

The three pivotal provisions of the Act are 18 U.S.C. §§ 2510(11), 2511(1)(c), and 2515.

Section 2510(11) provides that " 'aggrieved person' means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed". This definition is a codification of the traditional rule of standing, reaffirmed by the Supreme Court in Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), that a person may challenge the admission of evidence on search and seizure grounds only if he alleges that his *own* Fourth Amendment rights, and not those of a third party, have been violated.[1] Taking Sister Egan's allegations of wiretapping as true, as we must given the posture of this case, I think she is plainly an "aggrieved person" within the meaning of Section 2510(11).

Section 2515 reads in full as follows:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and *no evidence derived therefrom* may be received in evidence in any trial, hearing, or other proceeding in or before any court, *grand jury*, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof *if the disclosure of that information would be in violation of this chapter.*" (Emphasis supplied)

It seems clear that, as here applied, the final italicized proviso means simply this: When government officials attempt to disclose information derived from wire or oral communications intercepted without obtaining the authorization required by Sections 2516, 2517 and 2518(1) through (8) and therefore attempt to violate the criminal provisions of Section 2511(1)(c) [2], the evidentiary sanction of Section 2515 becomes operative. There is nothing ambiguous about that sanction. Therefore, assuming once again that Sister Egan's allegations are

---

application was in accord with the Act, whether the scope of the questions exceeded the grant of immunity, and whether the Fifth Amendment may be infringed despite immunity when the questions exceed the scope of immunity. However, in view of the fact that the rehearing en banc was convened primarily to hear argument regarding the use of illegal electronic surveillance in interrogating a grand jury witness, we have not considered them here.

1. The Court in *Alderman*, in footnote 9, 394 U.S. at 175, 176, 89 S.Ct. 961, noted the identity between the standing rule enunciated in that case and the definition of "aggrieved person" in the Act. I do not believe that either footnote 9 or *Carter v. United States*, 417 F.2d 384 (9th Cir. 1969) can be read as speaking to the additional, and significantly different, "standing" issue involved in this case. *Alderman* and *Carter* denied standing to parties who *vicariously* assert violations of a third person's Fourth Amendment rights. Neither case is helpful, however, in deciding whether a person in Sister Egan's position, who alleges a violation of her *own* Fourth Amendment rights, ought to be denied standing for *other* reasons.

2. Section 2511(1)(c) provides:
   "Except as otherwise specifically provided in this chapter any person who—
   \* \* \* \* \*
   (c) willfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection \* \* \*
   \* \* \* \* \*
   shall be fined not more than $10,000 or imprisoned not more than five years, or both."

true, the eliciting of testimony from Sister Egan, through questions based upon information obtained through illegal electronic surveillance, would be in direct conflict with the disclosure provisions of Section 2511(1)(c) and the evidentiary prohibition in Section 2515 against the introduction of "evidence derived" from an illegal surveillance,[3] as well as with the purposes and spirit of the legislation as a whole.[4] In this posture, Sister Egan's judicially-compelled disclosures would in reality be the illegal disclosures of the Government and not the voluntary disclosures of a party to an oral communication.

The Government urges, however, that, notwithstanding the evidentiary prohibition in Section 2515, Sister Egan may not challenge her subpoena or the questions asked of her since Section 2518(10)(a), read in conjunction with its legislative history, does not confer upon a mere grand jury witness "standing" to make a motion to suppress. Appellant urges the opposite interpretation of Section 2518 (10)(a). Although both Judge Adams, in Part I of his opinion, and Judge Gibbons agree with appellant on this point, I would not reach the question in this case since its resolution does not, in my opinion, materially affect the result.[5]

Assuming the remedy in Section 2518 (10)(a) to be unavailable to a grand jury witness, a prosecutor would presumably be able to call as a grand jury witness an agent who made or listened to illegal tapes, or he could even introduce the tapes themselves into evidence (although in both instances he would be violating the law), and no party to the illegally-overheard conversations would have a remedy by way of a motion to suppress. That is not this case, however. I think it is quite a different matter when, as here, the prosecutor attempts to elicit the testimony of an *aggrieved person himself*. When this occurs, I believe that, *regardless* of the interpretation accorded Section 2518(10)(a), the aggrieved person should be able to stand mute and in the event of a subsequent civil contempt proceeding, raise the unequivocal prohibition of Section 2515 as a defense to a finding of contempt, unless the prosecutor can show an untainted independent basis for the questions sought to be asked. This is the rule of this case. In this and similar cases, this rule will provide substantially all the protection afforded by Section 2518(1)(a) without in any way being dependent upon that Section for its validity.[6] It is man-

3. In addition to being criminally liable under Section 2511(1) (c), the prosecutor would also be civilly liable for damages under Section 2520.

4. "No one quarrels with the proposition that the unauthorized use of [electronic eavesdropping] techniques by law enforcement agents should be prohibited * * *. The prohibition, too, must be enforced with all *appropriate sanctions*. Criminal penalties have their part to play. But other remedies must be afforded the victim of an unlawful invasion of privacy. Provision must be made for civil recourse for damages. *The perpetrator must be denied the fruits of his unlawful actions in civil and criminal proceedings*." S.Rep. No. 1097, United States Code, Congressional and Administrative News, 90th Cong., 2d Sess., pp. 2112, 2156 (1968). (Emphasis supplied).

5. I would join my two brethren if a reading of 18 U.S.C. § 3504(a) overcame my doubts as to the applicability of Section

2518(10) (a) to the facts of this case. However, in view of the legislative history of Section 3504(a), H.Rep. No. 91–1549, United States Code, Congressional and Administrative News, 91st Cong., 2d Sess., pp. 4007, 4027 (1970), I am not convinced that that section can be read as altering Congress' intent as to the scope of § 2518 (10) (a), expressed by the Senate Committee on the Judiciary in its report on the Omnibus Crime Control and Safe Streets Act of 1968. S.Rep. No. 1097, United States Code, Congressional and Administrative News, 90th Cong., 2d Sess. pp. 2112, 2195 (1968). Despite Judge Adams' exhaustive analysis of the Senate Report, I think a good case can still be made that Congress' intent as to the reach of Section 2518(10) (a) is not consistent with the position taken in the opinion of the court.

6. Technically, of course, there is a distinction between the remedy provided by Section 2518(10) (a) and the remedy provid-

dated instead by the express prohibition in Section 2515.

Since Section 2515, in my opinion, compels this result, and since Congress in enacting Section 2515 undoubtedly weighed the competing policy considerations involved in excluding tainted evidence from grand jury consideration, I do not think this Court may now, sitting as a super-legislature, substitute its judgment on policy for that of the Congress.[7] Even if our views on the policy questions were relevant, however, my conclusion would be the same, since I am convinced that, on balance, the public interest is best served by the result we reach.[8]

Our result is in harmony with, and in furtherance of, Congress' strongly-expressed desire to eliminate illegal electronic eavesdropping. It provides victims of illegal surveillance with a semblance of some minimal relief in the fact of "an unlawful invasion of privacy". Perhaps more importantly, it relieves judges of the anomalous duty of finding a person in civil contempt for failing to cooperate with the prosecutor in a course of conduct which, if pursued unchecked, could subject the prosecutor himself to heavy civil and criminal penalties.[9] "Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions." Terry v. Ohio, 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L. Ed.2d 889 (1968).

I do not believe that the countervailing costs in the form of possible interference with grand jury procedures, will out-balance these benefits. Only a very small percentage of witnesses called before grand juries are hostile to the government's case. Even if *all* future hostile witnesses stand mute and raise a Section 2515 issue, presumably there will have been no wiretaps at all in a very high percentage of those cases, and a contempt hearing will take no longer than the prosecutor's representation to that

---

ed in the context of a civil contempt proceeding. Since the former allows the aggrieved party to make his challenge even before questions are asked of him and therefore relieves him of the necessity of being a party to a civil contempt proceeding. Upon inspection, however, the distinction loses its substance, since in *either* case the Court must pass upon the witness' Section 2515 claim *before* it may issue a *citation for contempt.* Therefore, the risks to the party claiming to be aggrieved are the same in both cases. Furthermore, there are really no procedural advantages, from the witness' point of view, in a Section 2518(10) (a) proceeding, since the advance disclosure provisions of Section 2518(9) clearly do not apply to grand jury proceedings. S.Rep. No. 1097, United States Code, Congressional and Administrative News, 90th Cong. 2d Sess., pp. 2112, 2195 (1968).

7. In his dissent my Brother Gibbons recognizes this when he states:
   "Of course if the result is compelled by case law *or statute* my judgment that the result is harmful to the public interest counts for little." (Emphasis supplied)

8. To the extent that Judge Gibbons' dissent reflects his concern over the prac-

tical consequences of the constitutional holding suggested in Part III of the Court's opinion, it focuses unnecessarily on consequences which cannot flow from the *actual* holding of this case. The result in this case is predicated on the reasoning of Part II of the opinion of the court, in which all five judges constituting the majority concur. Parts I and III, on the other hand, reflect the views of only two members of the Court (Chief Judge Hastie and Judge Adams).

9. The fact that the Omnibus Crime Control and Safe Streets Act was passed *after* the Second Circuit's decision in United States ex rel. Rosado v. Flood, 394 F.2d 139 (2d Cir. 1968) is another crucial factor, in addition to those mentioned in the foregoing opinion of the court, in distinguishing that case from our own. The Second Circuit was not confronted with the express prohibitions in that Act. Furthermore, Congress' great concern over unlawful electronic surveillance, as expressed in the Report of the Senate Committee on the Judiciary (see, e. g., footnote 4, supra), was not made known until five days after *Rosado* was decided (the opinion was filed on April 24, 1968; the Senate Report was published on April 29, 1968).

effect. Only where there actually has been a wiretap will a hearing be in any way extended. In those instances where the wiretap has been duly authorized, the hearing should generally be relatively brief. I would expect that the percentage of unauthorized wiretaps will be extremely low, especially under the rule we adopt, and that the need for extended hearings will be proportionately slight. In the unlikely event, however, that the number of such cases is higher than I expect, the increased burden on the operation of grand juries will be more than offset, in my opinion, by the increased need for a prophylactic rule which such a disregard for the law would evidence.

Finally, I should add that I agree that the grant of immunity under Section 2514 in this case cannot cure a violation of Section 2515. The grant of transactional immunity provided for in Section 2514 properly eliminates any Fifth Amendment objections which a witness may have, since a Fifth Amendment violation does not mature until compelled testimony is introduced "against" that witness in a criminal proceeding. This is not true of Fourth Amendment violations, however, which mature, and are complete, at the time of the illegal search. It is no answer to an invasion of a person's privacy, therefore, to assure him that he will be forever protected against the *consequences* of such an invasion, since the Fourth Amendment protects persons from unreasonable searches and seizures *themselves*, not merely from the consequences, criminal or otherwise, which flow therefrom. See Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L. Ed.2d 1081 (1961); Terry v. Ohio, supra.

For the foregoing reasons, I join in the vacation of the District Court's judgment of contempt.

SEITZ and VAN DUSEN, Circuit Judges, join in this opinion.

HASTIE, Chief Judge, who has joined in the opinion of ADAMS, Circuit Judge, believes that the reasoning in this opinion also is sound and provides adequate support for the decision of the court.

GIBBONS, Circuit Judge (dissenting).

The majority decision has the following effects:

1. What was formerly a limited exclusionary rule of evidence operating on behalf of defendants in criminal proceedings is now an unqualified witness privilege.

2. That unqualified witness privilege applies in every proceeding, state or federal, civil, criminal or administrative.[1]

3. A decision on the recognition or nonrecognition of the witness privilege will result in an appealable order.[2]

4. The privilege, at least according to Judge Adams, applies not only to witnesses who have been subjected to electronic surveillance, but to witnesses whose fourth amendment rights have been violated in any way.

An appreciation of the full reach of this new witness privilege can be gained by hypothesizing a situation which could conceivably arise in the very proceedings out of which this case arose. Suppose that there was in fact unlawful electronic surveillance of Sister Egan's telephone,

1. 18 U.S.C. § 2515 (Supp. V, 1970).

2. Whether in a contempt proceeding or otherwise, such a decision is a final order in a collateral proceeding. Compare Carroll v. United States, 354 U.S. 394, 77 S.Ct. 1332, 1 L.Ed.2d 1442 (1957), and Cogen v. United States, 278 U.S. 221, 49 S.Ct. 118, 73 L.Ed. 275 (1929), with Bessette v. W. B. Conkey Co., 194 U.S. 324, 24 S.Ct. 665, 48 L.Ed. 997 (1904), Steele v. United States (I), 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925), and Steele v. United States (II), 267 U.S. 505, 45 S.Ct. 417, 69 L.Ed. 761 (1925).

The United States can now appeal an adverse decision on a suppression motion made under Title III of the Omnibus Crime Control Act of 1968. 18 U.S.C. § 2518(10) (b) (Supp. V, 1970); cf. 18 U.S.C. § 3731 (Supp. V, 1970).

and suppose that from that surveillance the government learned that Sister Egan has information which is decidedly helpful to the defense of one of those indicted; Father Berrigan, for example. If the government disclosed to Father Berrigan that Sister Egan would be a helpful witness, a disclosure compelled by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Sister Egan could nevertheless under the majority holding refuse to testify. That hypothetical illustrates, for me at least, the tremendous difference between an exclusionary rule of evidence operating for the benefit of a party to litigation and thus within the party's control, and an unqualified witness privilege.

Indeed, there is much language in Judge Adams' opinion from which one could conclude that more than a witness privilege is operating; language to the effect that the judicial process is flatly barred from availing itself of the "tainted" truth of which the witness has knowledge.[3] I am not convinced that either the framers of the fourth amendment or the members of the Ninetieth Congress intended any such result.

Certainly nothing in the history of the exclusionary rule as it was developed by the Supreme Court under the fourth amendment and under § 605 of the Federal Communications Act, 47 U.S.C. § 605 (1964), lends support for turning a limited exclusionary rule of evidence into a witness privilege or a flat prohibition. Indeed, as I will develop hereinafter, the cases in the Supreme Court show that

this was not the intention. Congress, I believe, intended to go no further than the court had gone.

I start by calling to mind two fundamental considerations. First, it has been recognized for at least three centuries that the public has the right to every person's testimony. Every witness privilege is seriously in derogation of a general and fundamental duty. United States v. Bryan, 339 U.S. 323, 333, 70 S.Ct. 724, 94 L.Ed. 884 (1950); Blackmer v. United States, 284 U.S. 421, 438, 52 S.Ct. 252, 76 L.Ed. 375 (1932); Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919). That duty exists despite the fact that it always involves a sacrifice not only of time and convenience but also of the privacy to which so much of the majority opinion is devoted. The witness' privacy yields to a paramount public interest even though his testimony may subject him to enmity, ridicule, danger or disgrace. That paramount public interest outweighs considerations of witness privacy because the whole life of the community depends upon how well the institutions of justice perform their role of social lubricator.

Next, we must keep before us the nature of the American judicial process. It resolves cases and controversies in an adversary setting. It does not have machinery for righting all wrongs which may surface in any given case or controversy. Determination of the rights of third parties inevitably interrupts, delays and confuses the primary litiga-

---

3. Early in his opinion Judge Adams eschews this result, stating: "[W]e suggest that it unqualifiedly bars *the party making the illegal tap;* not the party who has been victimized—the 'aggrieved party.'" Later, however, he says:

"In the present case the District Court had a duty to follow the express direction of Congress found in § 2515. By ordering Sister Egan to testify before the grand jury when Congress has legislated the exclusion of such evidence, the District Court simply acted inconsistently with the legislative mandate." If, as he urges, the purpose of the statute is to protect the integrity of the courts

from the use of "tainted" evidence, it is difficult to understand why the decision as to such use should be left to the witness rather than to the court. I suggest that the purpose of the statute is to protect defendants—parties—from the use of evidence obtained in violation of their constitutional rights, and that it should not be extended beyond this purpose. Moreover, the statement that the statute bars only *"the party making the illegal tap"* is plainly wrong. Certainly Congress did not intend to revive the silver platter doctrine.

tion. Especially is this so when the third party may pursue appeals which, as to the main litigation, are interlocutory. When the determination of the rights of third parties is done, as here, for the purpose of imposing sanctions for past injury to the third party, the litigants and the judicial process, rather than the wrongdoer, are made to incur the sanction. In a criminal trial if the government is deprived of the third party testimony it is the commonweal rather than the wrongdoer which has been punished.[4] If the defendant is deprived of the third party testimony the defendant has been deprived of a fundamental civil right; a right so important it is enshrined in the compulsory process clause of the sixth amendment.[5] If in a civil action a witness is permitted to claim this privilege, a worthy and innocent litigant may be denied relief.

In light of these two fundamental considerations: the need for witness testimony, and the inconvenience of righting third party wrongs in a given case, the creation of a witness privilege is not a step to be taken lightly. Speaking of the less drastic step of an exclusionary rule to which a party may resort, Justice Frankfurter wrote:

"Any claim for the exclusion of evidence logically relevant in criminal prosecutions is heavily handicapped. It must be justified by an over-riding public policy expressed in the Constitution or the law of the land." Nardone v. United States, 308 U.S. 338, 340, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939).

The majority opinion attempts to minimize the potential effect on the judicial process of litigating a new third party privilege by saying, "We assume that the Government will attempt to conduct surveillance within statutory and constitutional limits, and that only in a slight number of cases will there be a violation of the rules governing wiretapping." This assumption, supported by no empirical foundation, undermines the only public policy which could possibly be weighed in favor of the witness privilege. By hypothesis the invasion of privacy about which a given witness complains has already occurred. The only public policy consideration favoring imposition of an evidentiary sanction on the government is that such a sanction is needed to deter anticipated future violations.[6] If violations are, as the majority

4. 18 U.S.C. § 2515 applies not only to government wiretapping but to any wiretapping. 18 U.S.C. § 2511. The wrongdoer may not even be in the control of the governmental authority which incurs the sanction.

5. Scholarly discussion of the full reach of the compulsory process clause has not been extensive. One commentator suggests that the availability of compulsory process is subject to recognized privileges. 8 Wigmore, Evidence, 69 (McNaughton rev., 1961). This is not at all a necessary interpretation of the sixth amendment. It is inconceivable that the right of a criminal defendant to compulsory process for the attendance of witnesses guaranteed by that amendment is subject to the unrestrained power of Congress to create privileges. How far, for example, would the courts permit Congress to extend the sovereign's privilege to conceal relevant facts by enlarging the persons and subject matters covered by executive privilege? See Totten, Adm'r v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875); cf. 18

U.S.C.A. § 3500 (Supp.1971); 46 U.S.C. § 784 (1964); 45 U.S.C. § 41 (1964); 49 U.S.C. § 1441(e) (1964). Our best guess is that the witness in this case sides with the defendants and would waive her privilege if her testimony would be helpful. But the constitutional interpretation announced in the majority opinion will operate both ways. Foresight is important in decision making. This year's hard case may be next year's nightmare. The majority opinion may in the future be cited as authority for congressional authority to erode the compulsory process guarantee.

6. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

opinion assumes, likely to be rare, how does the need for the sanction outweigh both the need for the testimony and the harm of litigating third party claims?

The majority opinion also suggests that in most instances the third party litigation will not be a serious interference. It suggests that, "in most cases the Government will simply represent to the court that no electronic surveillance has been employed by the Government," and that, "[o]nly in a minimal number of cases do we expect that the Government will be found to have conducted electronic surveillance in violation of the statute * * *." Both suggestions unrealistically conceal the practicalities which courts will face. In the first place, to the extent that the decision is based upon the ,fourth amendment rather than on 18 U.S.C. § 2515, the third party witness will be able to litigate any search and seizure question, not only questions arising out of electronic surveillance. This will include litigation over the propriety of the magistrate's action in authorizing the warrant. In the second place the statute reaches not only electronic surveillance made by the federal government, but all such surveillance, even by private persons. The discovery procedure specified in Alderman v. United States, *supra*, even as limited by the Organized Crime Control Act of 1970, 18 U.S.C.A. § 3504 (Supp.1971), requires disclosure to the witness of all such surveillance, assuming the witness has the rights created by the majority opinion. Undoubtedly in many cases the raw files of the Justice Department will contain references to surveillances conducted by state agencies or private persons. Particularly is this true in the area of organized crime. If any such information is in the Justice Department's files a witness will demand a hearing as to whether the information about which the government proposes to inquire has an origin independent of the electronic source.

The majority suggests that, " * * * the primary matter of inquiry would be whether the Government can demonstrate an independent basis, aside from

the illegal surveillance, upon which to justify the questions propounded before the grand jury." This implies that the issue of witness privilege will arise only at the grand jury stage. But if it is a witness privilege it can be asserted at any stage of all of the proceedings listed in 18 U.S.C. § 2515. It will certainly be asserted in many civil actions; government antitrust suits, for example. The privilege, asserted at the trial stage in any civil or criminal trial and resulting in an appealable order, will provide a new means for interfering with the orderly disposition of cases, the full consequences of which cannot be disregarded as easily as the majority suggest.

Thus I reject categorically the assumption that the impact of the majority ruling will be slight. It will have a significant impact on a system of justice already overburdened by the disposition of disputes between parties directly concerned. Adding any number of third party witness controversies, even a small number, will be harmful to the administration of justice.

Of course if the result is compelled by case law or statute my judgment that the result is harmful to the public interest counts ,for little. But I do not agree that either the case law construing fourth amendment or the statute, enlightened by its legislative history, compels the result reached by the majority.

Before discussing either the case law or the statute we can set to one side a non-issue—standing in the Article III sense. It is perfectly clear that a witness can create a case or controversy to test the existence of a witness privilege by standing in contempt of an order to testify. E. g., Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951) (claim of privilege against self-incrimination); Blau v. United States, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951) (claims of privilege against self-incrimination and husband-wife communications privilege); Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (claim of attorney-client privilege); Caldwell v. United States,

434 F.2d 1081 (9 Cir. 1970), cert. granted, 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed. 2d 109, (1971) (claim of news source privilege). Moreover, it makes no difference that the witness asserts his privilege in a grand jury proceeding. If it exists it can be raised. The omission of the word grand jury in 18 U.S.C. 2518 (10) (a) is not, for standing purposes, significant since the contempt proceeding becomes a separate proceeding from the grand jury inquiry. Furthermore, the omission of the term "grand jury" in Section 2518(10) (a) of the Omnibus Crime Control Act of 1968 would seem to have been corrected by Section 702 of the Organized Crime Control Act of 1970. 18 U.S.C.A. § 3504(a) (Supp., 1971). The fact of standing to litigate the issue of witness privilege, however, does not support the conclusion that the privilege exists.

The privilege must be found either in the Omnibus Crime Control Act of 1968 or in the Supreme Court's exegesis of the fourth amendment. Starting with the statute, Section 2515 reads:

> "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence * * * *if the disclosure of that information would be in violation of this chapter.*" (Emphasis supplied)

This section applies to the contents and fruit of *every* interception, both lawful and unlawful, but it applies only if some other section of the chapter makes disclosure unlawful. Section 2515 is not self-operating. The only section of the chapter which makes disclosure unlawful is 18 U.S.C. § 2511(1) (c):

> "(1) Except as otherwise specifically provided in this chapter any person who—
>
> * * * * * * *
>
> (c) wilfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was ob-

tained through the interception of a wire or oral communication in violation of this subsection; * * *

> shall be fined not more than $10,000 or imprisoned not more than five years, or both."

Section 2517 lists the "otherwise specifically provided" instances in which disclosure of intercepted communications may be made. Significantly, that section shows that Congress was aware of the distinction between an exclusionary rule of evidence and a personal privilege, for subsection (4) provides:

> "(4) No otherwise privileged wire or oral communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character."

Of that subsection the Senate Report on the bill says:

> "Traditionally, the interest of truth in the administration of justice has been subordinated in the law to the interest of preserving privileged communications where four relationships have been involved: physician-patient, lawyer-client, clergyman-confidant, and husband-wife. The scope and existence of these privileges varies from jurisdiction to jurisdiction. The proposed provision is intended to vary the existing law only to the extent it provides that an otherwise privileged communication does not lose its privileged character because it is intercepted by a stranger." S.Rep.No. 1097, 90th Cong., 2d Sess. (1968), 1968 U.S.Code Cong. & Adm.News at p. 2189.

If a witness privilege was created by Title III of the Omnibus Crime Control Act of 1968 it was created by the language of 18 U.S.C. § 2511(1) (c) quoted above. Since Congress was well aware of the distinction between exclusionary rules of evidence and witness privileges, and at one point treated the latter separately, I cannot read into § 2511(1) (c) the intention ascribed to it by the majority. That language is broadly prohibitory. Yet it cannot be given a literal

reading that would flatly prevent any use of a conversation once that conversation has been intercepted. Were this the case, if my telephone was tapped and I learned of the tap I would thereafter be prohibited from testifying to the contents of the overheard conversation. Short of a literal prohibitory reading which would apply § 2511(1) (c) to the victim as well as the interceptor, there is no language from which a witness privilege may be implied.

Additional light on congressional intention can be gained from the Senate Report's discussion of § 2517(1) and (2), the subsections authorizing disclosure of certain interceptions:

"Neither paragraphs (1) or (2) are limited to evidence intercepted in accordance with the provisions of the proposed chapter, since in certain limited situations disclosure and use of legally intercepted communications would be appropriate to the proper performance of the officers' duties. For example, such use and disclosure would be necessary in the investigation and prosecution of an illegal wiretapper himself. (See United States v. Gris, 146 F.Supp. 293 (S.D.N.Y.1956), affirmed 247 Fed. 860 (2d 1957)) [sic]." S.Rep. No. 1097, supra, at p. 2188.

Another instance where disclosure of even an illegally intercepted communication would be required by the proper performance of the officers' duties would be the furnishing of information helpful to the defense in a criminal case. Brady v. Maryland, supra. Certainly in the case of the prosecution of a wiretapper or in the case of discovery of a witness helpful to the defense Congress did not intend to preserve the officers' duty to prosecute or to disclose, but give the witness a privilege not to cooperate.

The majority opinion relies upon the definition of aggrieved person in § 2510 (11):

" 'Aggrieved person' means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed."

The Senate Report says:

"This definition defines the class of those who are entitled to invoke the suppression sanction of section 2515 discussed below, through the motion to suppress provided for by section 2518 (10) (a), also discussed below. It is intended to reflect existing law (Jones v. United States, 80 S.Ct. 725, 362 U. S. 257 [4 L.Ed.2d 697] (1960); Goldstein v. United States, 62 S.Ct. 1000, 316 U.S. 114 [86 L.Ed. 1312] (1942); Wong Sun v. United States, 83 S.Ct. 407, 371 U.S. 471 [9 L.Ed.2d 441] (1963); see United States ex rel. De Forte v. Mancusi, 379 F. 897 (2d 1967) (sic), certiorari granted, Jan. 22, 1968, No. 844, (1967 Term)."[7] S. Rep. No. 1097, supra, at pp. 2179–80. Each of the cases cited in the Senate Report involved a suppression motion by a defendant in a criminal case in his capacity as a defendant. In Jones v. United States, supra, Justice Frankfurter wrote:

"Rule 41(e) [Fed.R.CrimProc.] applies the general principle that *a party* will not be heard to claim a constitutional protection unless he 'belongs to the class for whose sake the constitutional protection is given.' " 362 U.S. at 261, 80 S.Ct. at 731 (emphasis added)

Goldstein v. United States, *supra*, holds that despite the decisions in Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939) and Nardone v. United States, *supra*, testimony of co-conspirators obtained as a result of wiretaps which violated 47 U.S.C. § 605 is properly admissible in evidence against a defendant not a party to the intercepted conversation. It seems clear that in defining aggrieved person in § 2510(11) Congress intended no more than to refer to the same persons who would have been aggrieved persons under Rule 41(e)

7. Aff'd, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968).

or under § 605 of the Federal Communications Act. Standing, in the sense of who may make a Rule 41(e) motion, as distinguished from standing in the conventional Article III sense, is an issue. But stating the issue as one of standing is only another way of asking if the witness privilege exists. The majority opinion cites no cases and I have found none, in which the court permitted a suppression motion under § 605 of the Federal Communications Act on behalf of a person not a defendant. The majority opinion cites no case, and I have found none, holding that a stranger to a criminal proceeding can make a motion under Rule 41(e). Grant v. United States, 282 F.2d 165 (2 Cir. 1960) is certainly not such a case. The court there held that an *ex parte* order directing the United States Attorney to show cause why certain evidence should not be presented to the grand jury was not an appealable order. Judge Friendly expressed doubt about the propriety of granting the relief requested, a doubt amply vindicated by the subsequent decision of the Supreme Court in United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed. 510 (1966). United States v. Foley, 283 F.2d 582 (2 Cir. 1960) is even less in point. It is merely another phase of the litigation in Grant v. United States, *supra*. The cases involved taxpayers who were target defendants in a tax fraud investigation not yet indicted. Thus the taxpayers were not moving merely as witnesses. After the *Grant* decision they sought discovery of certain documents in the government's possession in connection with the hearing on the order to show cause. The government sought review by way of mandamus of an order of the district court directing the submission to it of such documents for its inspection. The Second Circuit declined to issue the writ. Insofar as the case bears on the issue presented here, Judge Friendly reiterated his doubt about the sufficiency of the taxpayer's motion. He held, however, that the motion was not so clearly lacking in merit as to warrant interference by mandamus before the district court heard the matter. Centracchio v. Garrity, 198 F.2d 382 (1 Cir. 1952), cert. denied, 344 U.S. 866, 73 S.Ct. 108, 97 L.Ed. 672 (1952), involved a target defendant who by the time the case reached the court of appeals had actually been indicted. Judge Magruder discussed those cases which suggest that when a potential defendant makes a pre-indictment suppression motion there may be federal jurisdiction to hear the motion based upon the court's inherent power to discipline the United States Attorney as an officer of the court. He held, however, that a pre-indictment petition seeking suppression lacks equity and should be dismissed without prejudice to its renewal, pursuant to Rule 41(e), after the indictment. Thus the case is a square holding that even a target defendant lacks standing to make a Rule 41(e) motion prior to an indictment.[8] Compare In re Fried, 161 F.2d 453 (2 Cir.); cert. denied, 331 U.S. 858, 67 S.Ct. 1751, 91 L.Ed. 1865 (1947).

In footnote 15 the majority opinion cites Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931), for the proposition that victims of illegal searches who were

8. United States v. Bell, 120 F.Supp. 670 (D.D.C.1954) is even farther off the mark. It involved the procedure for obtaining the return of property lawfully seized and possibly contraband. See 28 U.S.C. § 2461(b). The court merely put a time limit on the time within which the government must institute forfeiture proceedings. Cf. United States v. Fields, 425 F.2d 883 (3 Cir. 1970), holding that a Rule 41(e) motion is not the appropriate means for a third party to obtain the return of property, and remitting the third party to statutory remedies. Rodgers v. United States, 158 F.Supp. 670 (S.D.Cal.1958) involved a pre-indictment civil action for injunctive relief by a potential defendant. The court suggested that a Rule 41(e) motion was an adequate remedy at law. Language in that opinion indicating that a Rule 41(e) movant can be a nonparty must be read in the context of the facts of that case.

not defendants and not parties to any criminal proceeding could prior to the adoption of Rule 41(e) move to suppress. The case deals with a pre-indictment motion for return and suppression made by two persons who had been named in a criminal complaint and arrested. The motion was joined in by their corporate employer, technically a stranger to the criminal proceedings. The Supreme Court ordered the fruit of the seizure to be suppressed and returned, thus implying that the corporation was a proper movant. However, the interest of the corporation in the *return* of its documents was distinct from that of the defendants in having the evidence *suppressed*. While the case can possibly be read as allowing a stranger to criminal proceedings to move for the return of its unlawfully taken property, it does not hold that such a stranger may properly move to suppress evidence. The actual limited holding is that because the complaint filed before the Commissioner was defective and because no indictment was pending at the time of the appeal the denial of relief could be treated as a final order in a collateral proceeding for purposes of appellate jurisdiction. *Go-Bart* is not authority for the proposition for which it is cited, since the suppression motion was made in a criminal proceeding by defendants in that proceeding. That is made clear in Di-Bella v. United States, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962), which overrules *Go-Bart* insofar as it distinguishes, for purposes of finality, between pre-indictment and post-indictment suppression motions. In *DiBella* the Court wrote:

"We hold, accordingly, that the mere circumstance of a pre-indictment motion does not transmute the ensuing evidentiary ruling into an independent proceeding begetting finality even for purposes of appealability. Presentations before a United States Commis-

sioner, Go-Bart Importing Co. v. United States, 282 U.S. 344, 352–354, 51 S.Ct. 153, 75 L.Ed. 374, as well as before a grand jury, Cobbledick v. United States, 309 U.S. 323, 327, 60 S.Ct. 540, 84 L.Ed. 783, are parts of the federal prosecutorial system leading to a criminal trial. Orders granting or denying suppression in the wake of such proceedings are truly interlocutory, for the criminal trial is then fairly in train. When at the time of ruling there is outstanding a complaint, or a detention or release on bail following arrest, or an arraignment, information, or indictment—in each such case the order on a suppression motion must be treated as 'but a step in the criminal trial preliminary to the trial thereof.' Cogen v. United States, 278 U.S. 221, 227, 49 S.Ct. 118, 73 L.Ed. 275. Only if the motion is solely for return of property and is in no way tied to a criminal prosecution *in esse* against the movant can the proceedings be regarded as independent." 369 U.S. at 131–132, 82 S.Ct. at 660.

For such an independent proceeding looking to the return of property there must, of course, be an independent basis for federal jurisdiction.[9] Such an independent basis cannot be created by giving nonparties standing under Rule 41(e), and no case that has come to my attention has ever done so. If there is standing in this case it exists only because Congress has created a new witness privilege, not because nonparties have standing to make a suppression motion under Rule 41(e).

The congressional intention not to create such a privilege is clear when one considers the language of § 2518(10) (a) under which the Senate Report makes cross-reference to § 2510(11). That subsection says:

"Any aggrieved person *in* any trial, hearing, or proceeding in or before any

9. See Carroll v. United States, *supra*, 354 U.S. at 404 n. 17, 77 S.Ct. 1332; Cogen v. United States, supra, 278 U.S. at 226, 49 S.Ct. 118; United States v. Ponder, 238 F.2d 825 (4 Cir. 1956); cf. Smith v. Katzenbach, 122 U.S.App.D.C. 113, 351 F.2d 810 (1965).

court \* \* \* may move to suppress \* \* \*." (emphasis added)

The motion to suppress can only be made by a person aggrieved *in* a trial; that is, by an aggrieved *party*. The Senate Report makes clear what was intended:

"This provision must be read in connection with sections 2515 and 2517, discussed above, *which it limits*. It provides the remedy for the right created by section 2515. Because no person is *a party* as such to a grand jury proceeding, the provision does not envision the making of a motion to suppress in the context of such a proceeding itself. Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforcible by an individual. (Blue v. United States, 86 S.Ct. 1416, 384 U.S. 251 [16 L.Ed.2d 510] (1965)). There is no intent to change this general rule. It is the intent of the provision only that where a motion to suppress is granted in another context, its scope may include use in a future grand jury proceeding." S. Rep. No. 1097, *supra*, at p. 2195. (emphasis added)

Congress intended, in other words, that only *parties* to a proceeding have standing to make a suppression motion. No one is a party to a grand jury proceeding. Blair v. United States, *supra*.

It is also clear that the exclusionary rule announced in § 2515 is intended to be available only to parties. The Senate Report states:

"The provision [§ 2515] must, of course, be read in light of section 2518 (10) (a) discussed below, which defines the class entitled to make a motion to suppress. It largely reflects existing law. It applies to suppress evidence directly (Nardone v. United States, 58 S.Ct. 275, 302 U.S. 379 [82 L.Ed. 314] (1937)) or indirectly obtained in violation of the chapter. (Nardone v. United States, 60 S.Ct. 266, 308 U.S. 338 [84 L.Ed. 307] (1939)). There is, however, **no intention to change the at-**tenuation rule. See Nardone v. United States, 127 F.2d 521 (2d) [sic], certiorari denied, 62 S.Ct. 1296, 316 U.S. 698 [86 L.Ed. 1767] (1942); Wong Sun v. United States, 83 S.Ct. 407, 371 U.S. 471 [9 L.Ed.2d 441] (1963). *Nor generally to press the scope of the suppression role beyond present search and seizure law.* See Walder v. United States, 74 S.Ct. 354, 347 U.S. 62 [98 L.Ed. 503] (1954)." S.Rep. No. 1097, *supra,* at p. 2185 (emphasis added).

Congressional reference to *Walder* is significant. That case holds that evidence illegally obtained and suppressed in one trial can nevertheless be used against the defendant from whom it was illegally seized to contradict his perjury in a later trial. *Walder* puts the problem in perspective. The view of the Supreme Court is that the principal evil against which both the fourth amendment exclusionary rule and the statute are directed is the use of illegally obtained evidence for the purpose of incriminating the victim of that illegality. In Justice Frankfurter's words:

"The Government cannot violate the Fourth Amendment—in the only way the Government can do anything, namely through its agents—and use the fruits of such unlawful conduct to secure a conviction. Weeks v. United States, *supra.* Nor can the Government make indirect use of such evidence for its case, Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, or support a conviction on evidence obtained through leads from the unlawfully obtained evidence, cf. Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307. All these methods are outlawed, and the convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men.

It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the de-

fendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths." Walder v. United States, *supra,* 347 U.S. at 64–65, 74 S.Ct. at 356.

The Supreme Court has never applied the exclusionary rule in favor of anyone except a party. It has never read Silverthorne Lumber Co. v. United States, *supra,* to have the reach proposed by the majority. Justice Holmes used the words which the majority opinion quotes, but the juice of their context has been squeezed from them, and the husks used as a premise for a syllogism he never contemplated. The Government cannot affirmatively use illegally seized evidence to incriminate the victim of their illegality. It can use such evidence, even against the victim, to overcome perjury. Walder v. United States, *supra.* It can use such evidence against parties other than the victim of the illegality. Alderman v. United States, *supra;* Goldstein v. United States, *supra.*

In the one instance in which the Supreme Court has addressed itself to the electronic surveillance provisions of the Omnibus Crime Control Act of 1968 it has rejected the construction of the statute and of the fourth amendment announced by the majority. In Alderman v. United States, *supra,* the court said:

"The exclusionary rule fashioned in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) and Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), excludes from a criminal trial any evidence *seized from the defendant* in violation of his Fourth Amendment rights." 394 U.S. at 171, 89 S.Ct. at 965 (emphasis added)

The court then expressly approved Goldstein v. United States, *supra* and Jones v. United States, *supra*; 394 U.S. at 172–173, 89 S.Ct. 961. In discussing *Jones* it noted:

"The 'person aggrieved' language is from Fed.Rule Crim.Proc. 41(e). *Jones* makes clear that Rule 41 con-

forms to the general standard and is no broader than the constitutional rule." 394 U.S. at 173 n. 6, 89 S.Ct. at 966.

Later in the opinion the court says:

"Of course, Congress or state legislatures may extend the exclusionary rule and provide that illegally seized evidence is inadmissible against anyone for any purpose.[9]

"9. Congress has not done so. In its recent wiretapping and eavesdropping legislation, Congress has provided only that an 'aggrieved person' may move to suppress the contents of a wire or oral communication intercepted in violation of the Act. Title III, Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 221 (18 U.S.C. § 2518(10) (a) (1964 ed., Supp. IV)). The Act's legislative history indicates that 'aggrieved person,' the limiting phrase currently found in Fed.Rule Crim. Proc. 41(e), should be construed in accordance with existent standing rules. See S.Rep.No.1097, 90th Cong., 2d Sess., at 96, 106." 394 U.S. at 175 & n. 9, 89 S.Ct. at 967–968.

\* \* \* \* \* \* \*

The footnotes, granted, are dicta. But considering the source they are persuasive dicta. What to me is most convincing is the equating of "aggrieved person" in the statute to "aggrieved person" in Rule 41(e). If the majority opinion contained a citation to a single case in which a witness, in the capacity of witness only, was held to have standing to make a Rule 41(e) motion I would find more persuasive its effort to distinguish away the *Alderman* discussion.

The result in this case illustrates the *a priori* methodology of the appellate process. The courts started with the premise that an exclusionary rule of evidence would deter future unlawful police conduct. That premise had no empirical foundation. Satisfied with the perfection of its created rule the appellate process next elevated the rule to constitutional rather than pragmatic dignity. A rule which started as a means to a desired end thus became a constitutional right even though its effectiveness toward the desired end had never been demonstrat-

ed. It has never been demonstrated. It has never been demonstrated, for example, what proportion of electronic surveillance is resorted to by law enforcement personnel for preventive rather than conviction purposes. If, in an internal security situation, for example, the primary police object is to prevent the occurrence of terrorist acts, the exclusionary rule will have no pragmatic deterrent effect. But because the Supreme Court has said the exclusionary rule is a constitutional right the majority reasons that the right must now be vindicated on behalf of a class of persons with whom the Supreme Court did not deal, regardless of public interests which compete with the end first sought to be protected. Of course my conclusion that the new witness privilege will be harmful to the administration of justice, like the deterrence premise of the exclusionary rule, also lacks the support of empirical data. At least here, however, my prediction of the effect of the new rule is made in an area in which judges presumably have some expertise. But both sides would do well to look outside the reported decisions for guidance before choosing alternative public policies. Instead for the most part we re-grind the grist which we ourselves have created.

In this case since Sister Egan has been granted transactional immunity she is before the court solely in the capacity of a witness. Assuming the truth of her allegation that she was the subject of unlawful electronic surveillance,[10] she nevertheless should have no privilege, in that capacity, to withhold her testimony. Carter v. United States, 417 F.2d 384, 388 (9 Cir. 1969), cert denied, 399 U.S. 935, 90 S.Ct. 2253, 26 L.Ed.2d 807 (1970); United States ex rel. Rosado v. Flood, 394 F.2d 139, 141 (2 Cir.), cert. denied, 393 U.S. 855, 89 S.Ct. 111, 21 L.Ed.2d 124 (1968). I would affirm the order of the district court adjudging the appellant in civil contempt for refusing to obey a court order to testify before the grand jury.

ALDISERT, Circuit Judge, joins in this dissenting opinion.

FORMAN, Circuit Judge (dissenting).

I was a member of the panel that heard argument in the above-named case on January 29, 1971, the reargument before the court en banc on April 5, 1971, and participated in the conference thereafter. Subsequently I was deterred by illness from filing an opinion therein. Pursuant to the court's gracious reservation of the opportunity for me to express my decision after the filing of its opinion on May 28, 1971, I desire to join in the dissenting opinion of Judge Gibbons.

---

10. One among numerous objections to testifying.